IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EVELYN CAROL JACKSON,

             Petitioner,              No. CIV S-08-1753 WBS EFB P

    vs.

KEN EICHENBERGER,

             Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

      Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 2005 judgment of conviction entered against her in the Sacramento County Superior Court on charges of second degree murder and discharging a firearm at an inhabited dwelling. She seeks relief on the grounds that: (1) her constitutional rights were violated by the erroneous exclusion of evidence of third-party culpability; (2) her constitutional rights were violated by the trial court's failure to give a jury instruction; and (3) her conviction is not supported by sufficient evidence. Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

////

////

1

I.      **Factual Background**[1]

A jury convicted defendant Evelyn Carol Jackson of second degree murder and shooting at an inhabited dwelling place.  The jury sustained an allegation that a principal was armed with a firearm in the commission of the offense, and the trial court sentenced defendant to 15 years to life plus an additional year for the enhancement.

On appeal, defendant contends: (1) third party culpability evidence was improperly excluded; (2) the trial court should have instructed the jury on intervening cause; (3) there is insufficient evidence to support the second degree murder verdict; and (4) cumulative error warrants reversal.  We reject the contentions and affirm.

**BACKGROUND**

On October 25, 2003, Porchia Turk, her brother Kevin Turk, her sister Keyihuna Turk, and Keyihuna's friend Twin, drove to the Rainbow Market and bought some cigars.  Upon leaving the market, Porchia noticed a blue Oldsmobile Cutlass parked next to her car.  There were two Black women in the front of the Cutlass and two babies in the rear.

The two women in the Cutlass were staring at them as Porchia and her companions came out of the market.  Defendant was in the driver's seat of the Cutlass, Quiandra Deloney was in the front passenger seat, and Deloney's two children were in the rear of the Cutlass.

Defendant and Deloney stared at them for two or three minutes.  Defendant then said something like, "I didn't know bitches looked this good."  Keyihuna replied, "If I was stuck on bitches, it would not be none of you all hoes in the car."

Defendant then got out of the car, which led to all of the adults exiting the cars.  Defendant made a hard push at Keyihuna, who swung back, starting a fight.  Keyihuna's friend Twin started a fight with Deloney.

Porchia and her brother Kevin never participated in the fight.  The fight ended when Porchia started to back her car out of the Rainbow Market's parking lot.  As the fight broke up, Twin "jumped on top of [the Cutlass] and smashed the windshield in and said, 'This is how we do it in the town,'" a reference to Oakland.

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

2

Porchia saw defendant talking on a cell phone after the windshield of defendant's car was broken.  She heard defendant say, "We being jumped.  We being jumped.  Be strapped." "Strapped" is a reference to guns.  Porchia also heard defendant say, "Oh, ya'll gonna get popped."  As Porchia backed her car out of the parking lot, she heard defendant say "Follow them.  Follow them."

According to Kevin Turk's account of the incident, a blue Oldsmobile with two women and two children was parked next to them in the parking lot of the Rainbow Market.  He saw the driver of the Oldsmobile enter and leave the market.  Keyihuna and Twin were staring at the women in the other car, and the driver responded by asking them if they were interested in women.  Keyihuna replied with an insult, which eventually led to a fight between Keyihuna, Twin, and the two women from the Oldsmobile.  The fight stopped when Twin jumped on the windshield of the blue Oldsmobile and kicked the window in.  Twin said, "This is how Oakland do it."

The driver of the Oldsmobile made a call on a cell phone after Twin's statement.  Porchia decided to leave after this phone call.  The driver of the Cutlass was still on the cell phone as Porchia backed up.  Kevin recalled hearing the woman say on her phone, "These bitches up here jumping us."

Parmjit Singh, the owner of the Rainbow Market, came out during the fight.  He saw a woman step on the windshield of a car and break it while he was calling the police.  He saw defendant on the cell phone, explaining her location to the person she was calling.

Porchia drove quickly down McArthur Street with her sister, brother, and Twin while defendant followed in her Cutlass.  She made a quick U-turn and noticed a white car was following behind defendant's blue Cutlass.  The Cutlass and the white car both made U-turns and continued to follow her.

Porchia testified that defendant continued to use the cell phone while she was driving.  The two cars kept following Porchia as she drove to her apartment complex on 301 Doolittle Street.  Porchia and the passengers ran up to her apartment after she parked in the back of the apartment complex.  After telling friends and family in the apartment about the incident, they went out to the balcony to see what was happening.  Porchia saw the blue Cutlass and the white car outside her apartment complex.

Porchia heard a female voice from one of the cars yell, "Bitch, come on down here."  The people on the balcony and the occupants in the two cars began to yell at each other.  The verbal altercation lasted no more than three minutes before Porchia heard seven or eight gunshots coming from the white car.  She saw a flash coming

3

from the back seat of the white car, but no flashes from defendant's car.

Michael Ross, also known as "Bubba," and William McElroy, were roommates and downstairs neighbors of Porchia. McElroy, his girlfriend Heather Scott, and Bubba were returning to their apartment after going out to dinner, when McElroy noticed a bluish-gray Buick Regal and a white foreign car stopped at a stop sign on the corner of McArthur and Doolittle Streets.

McElroy's sister had told McElroy about the incident at the Rainbow Market as he parked his car. After seeing the two cars stopped at the stop sign, McElroy thought there might be trouble, so he got a handgun from his apartment.

The two cars started to drive when McElroy came out of his apartment. The women in the blue car were yelling at his neighbors in the balcony. He heard the women in the blue car yell things like, "Come out and fight, Bitch. You're gonna get it."

The girls in the blue car were Black, and McElroy thought he saw a car seat in the back. McElroy testified he saw Porchia, her mother, brother, sister, and a friend were on the upstairs porch yelling back at the women in the blue car. McElroy was outside watching with his gun tucked under his arm, while Bubba was standing about an arm's length from McElroy.

The two cars moved slowly down Doolittle towards McArthur. The blue car was in front, followed by the white car, which was no more than a foot behind. There were at least three Black males in the second car. A passenger in the second car rolled the window down and said, "What's up, fat boy."[2] The passenger stuck a gun out of the window, and McElroy saw a muzzle flash as the gun fired.

McElroy pulled his pistol from under his shirt and returned fire. He returned about two or three shots, while seven to nine shots came from the white car. Bubba never shot a weapon or had a gun during this encounter. McElroy had told the police Bubba was carrying two guns during the incident and had returned fire. He testified that this was a lie he had told to avoid getting into trouble for carrying a gun.[3]

Right after McElroy started shooting, he heard Bubba scream,

---

[2] Bubba was five foot eight inches and 225 pounds, McElroy is six foot one inch and 200 pounds.

[3] McElroy was on probation for assault with a deadly weapon. He testified under immunity.

4

"They shot me."  The cars drove down McArthur towards Raley Boulevard as McElroy kept on shooting.  After he was shot, Bubba ran towards the end of the apartment complex.  He kept running around until he collapsed in the middle of the yard.

Geneatta Lockhart lived in the apartment complex on Doolittle.  On the day of the murder, she had gone to bed early but was awakened by a car door slamming.  She heard a female voice say, "You don't know who you messing with.  I will blow this [place] up."  Shots were fired after this exclamation, and Lockhart dove to the floor.

Sacramento Police Officer Justin Saario responded to the scene of the shooting, where he found Bubba lying on the ground with a bullet wound in his lower throat area.  The officer also found a handgun about 10 to 20 feet between Bubba's body and the apartment complex.

Officer Scot Krutz took statements at the scene.  Kevin Turk told Officer Krutz he heard the women from the car which had followed them yell, "Bitch, I'll kill you" and "We're gonna shoot this [place] up."

Quiandra Deloney testified under a grant of immunity.  She was very close to defendant and her family, having known her since the age of 12. Deloney, her two children, and defendant intended to drive to the store and then drop the children off with her children's aunt before going to a club. They stopped at the Rainbow Market, where a fight broke out between Deloney, defendant, and two women from a car parked next to them.  The fight started after an exchange between defendant and a woman in the other car over why the women in the other car were staring at them.  The fight ended when a woman from the other car jumped on defendant's car and kicked in the front windshield.

Defendant was on the phone while two girls from the other car were fighting Deloney.  She did not hear defendant talk about getting jumped or making any references to being strapped while on the phone.  Defendant did tell Deloney that they were going to follow the other car.

Defendant made a U-turn as they followed the car to the apartment complex.  Deloney testified that the girls from the market were on the balcony yelling at her and defendant.  Deloney said, "Come downstairs, Bitch," to the women on the balcony.

Deloney noticed a white Camry or Honda behind defendant's car as they turned around near the apartment complex.  There were three or four Black men in the car whom Deloney did not recognize.

The yelling went on for about seven minutes before Deloney heard gunshots.

Deloney denied telling a male friend over the phone that she had been jumped, but was impeached with a statement made to a detective indicating she had called a male friend and told him about the fight.  She was also impeached with phone records of several calls made on her phone when defendant's car was following Porchia to the apartment complex.  Deloney was impeached with conversations with her mother while she was in jail, where Deloney implied she was covering for defendant and wanted to "tell."  Deloney said in another conversation with her mother: "[W]hen . . . we was jumping the gun . . ., they probably got that."

The victim, Bubba, was killed by a bullet wound of his upper chest/lower throat area.  There was gunshot residue on Bubba's hands, but the prosecution's expert witness explained this could be caused by being close to a gun when it was fired by another person.

Sometime after the shooting, defendant went to the UC Davis Medical Center where she was diagnosed with a dislocated shoulder.  An emergency room nurse at the UC Davis Medical Center testified that type of injury is very painful, but can be fixed quickly.

Defendant testified she never asked anyone to shoot the people from the parking lot fight, did not threaten to "pop" anyone, and had nothing to do with the shooting.  According to defendant, a black car with four Black men pulled up to her car while she was following Porchia.  They told her they were looking for someone and drove off.  Defendant did not notice any car following her as she turned from McArthur to Doolittle.  She heard female voices yelling from the direction of the balcony.

Defendant followed Porchia's car because she wanted to get the license plate number of the car and get the police involved.  She did not get the license number because defendant did not have a pen and she was in a lot of pain.  Defendant did not tell the emergency room personnel about the fight because she was afraid of retaliation in Oakland if she reported the incident.

Resp.'s Lodg. Doc. 2 (hereinafter Opinion) at 1-9.

////

////

////

6

**II.     Analysis**

    **A.  Standards for a Writ of Habeas Corpus**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010))

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

1   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

2   the writ if the state court identifies the correct governing legal principle from the Supreme

3   Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.

4   *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

5   F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

6   simply because that court concludes in its independent judgment that the relevant state-court

7   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

8   application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v.*

9   *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

10  habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

11  the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

12  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

13  of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

14  (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

15  condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

16  state court's ruling on the claim being presented in federal court was so lacking in justification

17  that there was an error well understood and comprehended in existing law beyond any possibility

18  for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

19          If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

20  court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

21  527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

22  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

23  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

24  considering de novo the constitutional issues raised.").

25          The court looks to the last reasoned state court decision as the basis for the state court

26  judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

8

If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

## B.  Petitioner's Claims

### 1.  Erroneous Exclusion of Evidence

Petitioner's first claim is that the trial court violated her federal constitutional rights when it excluded evidence that "the day before the shooting, at a location a block from the shooting, 'Northside' Mike had confronted Will (William McElroy) and specifically threatened to shoot Bubba at his residence." Dckt. 1 at 3. Petitioner argues that this evidence was necessary to

1  support her defense that she had no involvement in the shooting.  *Id.*  The California Court of

2  Appeal described the background to this claim, and its ruling thereon, as follows:

> Defendant claims the trial court improperly denied the admission
> of testimony that a third party had threatened to blow up Bubba's
> house.
>
> At the hearing to determine the admissibility of the third party
> culpability evidence, McElroy testified about a dispute between
> himself, Bubba, and a man named "North Side Mike" (Mike)
> which had lasted for a year.  In 2002, about a year before the
> shooting, McElroy got into a fight with Mike, "and he came back a
> couple of hours later and threw a brick through the window of our
> cars and then we just kept fighting."  They continued to have
> troubles with Mike until he moved out of the neighborhood.
>
> The day before the shooting, Mike was driving down the street in
> his Cadillac truck when he saw McElroy and asked him his name.
> Mike jumped out of his truck when McElroy told him who he was.
> McElroy walked over to fight Mike until a friend of Mike's
> jumped out of the truck.  McElroy then pulled out a gun and told
> Mike if he wanted a fight, they can go to the park and fight
> one-on-one.  Mike then told McElroy, "Bubba shot up my house.
> I'm going to come back later and shoot up his."
>
> McElroy also testified that all of the people in the car which
> contained the shooter were Black men.  Mike is White and belongs
> to the Peckerwoods, a White supremacist gang in Rio Linda.  When
> asked if Mike was behind Bubba's shooting, McElroy testified he
> knew it was not him because Black people were involved in the
> shooting.
>
> The trial court excluded the third party culpability evidence.  The
> court found the connection to the killing was too remote, as the
> occupants of the shooter's car were Black and Mike was associated
> with a White supremacist gang.
>
> To be relevant and admissible, "evidence of third party culpability
> must be capable of raising a reasonable doubt of the defendant's
> guilt; 'there must be direct or circumstantial evidence linking the
> third person to the actual perpetration of the crime.'  [Citation.]"
> (*People v. Davis* (1995) 10 Cal.4th 463, 501.)  Evidence of
> opportunity or motive, without more, is insufficient.  (*People v.
> Yeoman* (2003) 31 Cal.4th 93, 140-141.)  Courts treat evidence
> relating to third-party culpability "like any other evidence: if
> relevant it is admissible ([Evid.Code,] § 350) unless its probative
> value is substantially outweighed by the risk of undue delay,
> prejudice, or confusion ([Evid.Code,] § 352)."  (*People v.. Hall*
> (1986) 41 Cal.3d 826, 834.)  The trial court's decision to admit or
> exclude third party culpability evidence is reviewed for abuse of

discretion.  (*People v. Lewis* (2001) 26 Cal.4th 334, 372-373.)

The decision excluding the third party culpability evidence was not an abuse of discretion.  The evidence all points to the murder being committed by one or more Black men.  North Side Mike was White and a member of a White supremacist gang.  He was neither at the scene nor likely to have organized the shooting.  While defendant may have established Mike believed he had a motive to kill Bubba, motive alone is not sufficient to support admissibility. Since there was no evidence linking this person to the shooting, the trial court properly excluded the third party culpability evidence.

Defendant contends the recent United States Supreme Court decision in *Holmes v. South Carolina* (2006) 547 U.S. 319 [164 L.Ed.2d 503] (*Holmes*) recognizes a defendant's constitutional right to present third party culpability evidence.  She argues the trial court's ruling excluding the third party culpability evidence violated this right.

*Holmes* addressed a South Carolina rule of evidence preventing a defendant from introducing third party culpability evidence if there is forensic evidence strongly supporting defendant's guilt. (*Holmes, supra,* 547 U.S. at p. ---- [164 L.Ed.2d at p. 507].)  The Supreme Court recognized that "'[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.' [Citations.]" (*Id.* at p. 503 [164 L.Ed.2d at pp. 508-509].)  However, the Constitution guarantees defendants the right to present a defense, which "is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are '"arbitrary" or "disproportionate to the purposes they are designed to serve."' [Citations.]" (*Id.* at p. 503 [164 L.Ed.2d at p. 509].)  The Supreme Court determined the South Carolina rule was arbitrary and thus deprived the defendant of his right to present a meaningful defense.  (*Id.* at p. 503 [164 L.Ed.2d at p. 513].)

Defendant's contention is without merit.  As the Supreme Court noted in *Holmes*, "the Constitution permits judges 'to exclude evidence that is "repetitive . . ., only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues."' [Citation.]"  (*Holmes, supra,* 547 U.S. 319 [164 L.Ed.2d at p. 510].)  Defendant's third party culpability evidence was excluded under the standard rules of admissibility which apply to all evidence.

As the trial court noted, the evidence was minimally relevant. Since it also included testimony about a White supremacist gang, the testimony was also inherently prejudicial.  The Constitution does not create a special rule of admissibility for third party culpability evidence.  Excluding this evidence under the standard rules of evidence did not violate defendant's right to present a

1    defense.

2    Opinion at 9-12.

3        Petitioner claims that the trial court's exclusion of testimony regarding the threats made

4    by Northside Mike "eviscerated [her] defense that she had nothing to do with the shooting and

5    that the concurrent arrival of the second car was nothing more than a coincidence."  Dckt. 1 at 6.

6    Petitioner contends that, without this evidence, the jury was presented with an incomplete and

7    distorted picture of what happened on the night of the shooting.  *Id.*  Specifically, the jury never

8    learned that the reason Will and Bubba ran into their apartment to arm themselves was because

9    they believed the second car contained "Northside Mike or his emissaries who had come back to

10   make good on the threat made the day before."  *Id.* at 5; Dckt. 5 at 3.  Petitioner argues that "the

11   second car and its occupants were never identified and there was *zero* evidence linking

12   [petitioner] to the second car."  Dckt. 5 at 2.  Petitioner also notes that as the second car

13   approached the apartment, one of the occupants asked Bubba, "what's up, fat boy?" and that all

14   of the shots were directed at Bubba and Will, and not at the people on the second floor balcony.

15   *Id.* at 3.  She argues that this demonstrates the shooters were after Bubba and Will, and not

16   Porchia and Keyihuna.  In short, petitioner claims that the shooting resulted solely from the

17   dispute between Mike, Bubba, and Will, and that the simultaneous arrival of the second car at

18   Porchia's apartment was just a coincidence.

19       Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to

20   present a defense; this right is "a fundamental element of due process of law."  *Washington v.*

21   *Texas*, 388 U.S. 14, 19 (1967).  *See also Crane v. Kentucky*, 476 U.S. 683, 687, 690 (1986);

22   *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972);

23   *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009).  A defendant's right to present a defense

24   stems both from the Fourteenth Amendment right to due process and the Sixth Amendment right

25   "to have compulsory process for obtaining witnesses in his favor."  *Moses*, 555 F.3d at 757.  A

26   state violates the Sixth Amendment when it arbitrarily denies a defendant the right to put on the

1  stand a witness whose testimony "would have been relevant and material to the defense."

2  *Washington*, 388 U.S. at 23.

3         It is well-established, however, that "the right to present relevant testimony is not without

4  limitation.  The right 'may, in appropriate cases, bow to accommodate other legitimate interests

5  in the criminal trial process.'"  *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v.*

6  *Mississippi*, 410 U.S. 284, 295 (1973)).  A criminal defendant "must comply with established

7  rules of procedure and evidence designed to assure both fairness and reliability in the

8  ascertainment of guilt and innocence."  *Chambers*, 410 U.S. at 302.  Thus, a criminal defendant

9  "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or

10  otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410

11  (1988).  "Even relevant and reliable evidence can be excluded when the state interest is strong."

12  *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983).  "The Supreme Court has indicated its

13  approval of 'well-established rules of evidence [that] permit trial judges to exclude evidence if

14  its probative value is outweighed by certain other factors such as unfair prejudice, confusion of

15  the issues, or potential to mislead the jury.'"  *Moses*, 555 F.3d at 757.

16         A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief

17  only if it renders the state proceedings so fundamentally unfair as to violate due process.

18  *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th

19  Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  A state law justification

20  for exclusion of evidence does not abridge a criminal defendant's right to present a defense

21  unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the

22  accused."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  *See also Crane*, 476 U.S. at 689-

23  91 (discussion of the tension between the discretion of state courts to exclude evidence at trial

24  and the federal constitutional right to "present a complete defense"); *Greene v. Lambert*, 288

25  F.3d 1081, 1090 (9th Cir. 2002).  "A habeas petitioner bears a heavy burden in showing a due

26  process violation based on an evidentiary decision."  *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th

1    Cir. 2005).

2         Petitioner has failed to demonstrate that the decision of the California Court of Appeal

3    was contrary to or an unreasonable application of clearly established Supreme Court precedent,

4    or that it was based on an unreasonable determination of the facts of this case.  The Ninth Circuit

5    has observed that the Supreme Court's inquiry in this area has been limited to "cases where

6    defendants have argued that state evidentiary rules, by their own terms, impinged upon their

7    constitutional right to present a complete defense."  *Moses,* 555 F.3d at 757.  For instance, in

8    *Holmes*, the Supreme Court struck down a South Carolina rule of evidence which provided that a

9    defendant could not introduce evidence of third-party guilt if the prosecution had introduced

10   forensic evidence that, if believed, strongly supported a guilty verdict.  The court reasoned that

11   this rule, on its face, had the potential to exclude even relevant evidence that had "great

12   probative value" and would not pose an undue risk of prejudice or confusion.  *Holmes*, 547 U.S.

13   at 329.

14        Here, on the contrary, petitioner's proffered evidence was excluded under sections 350

15   and 352 of the California Evidence code.  These well-established state rules require evidence to

16   be relevant in order to be admissible, and vest the trial court with discretion to exclude evidence

17   if its probative value is substantially outweighed by undue consumption of time, undue

18   prejudice, confusion of the issues, or potential to mislead the jury.  As set forth above, state

19   courts have "wide latitude" to exclude evidence that is "marginally relevant."  *Crane,* 476 U.S.

20   at 689-90; *see also Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) ("A defendant has no

21   right [ ] to present irrelevant evidence.").  Further, "well-established rules of evidence permit

22   trial judges to exclude evidence if its probative value is out-weighed by certain other factors such

23   as unfair prejudice, confusion of the issues, or potential to mislead the jury."  *Holmes*, 547 U.S.

24   at 326.  Petitioner's proposed evidence was also excluded pursuant to state law regarding the

25   admissibility of third-party culpability evidence, on the grounds that the evidence was unduly

26   speculative.  Under the federal constitution, evidence offered to show that someone else

14

1   committed the crime with which the defendant is charged "may be excluded where it does not

2   sufficiently connect the other person to the crime, as, for example, where the evidence is

3   speculative or remote . . . ." *Id.* at 327.  None of the rules relied on by the trial court to exclude

4   petitioner's proposed evidence of third-party culpability are unconstitutional on their face.

5          In essence, petitioner is claiming that the trial court's discretionary determination to

6   exclude testimony regarding "Northside Mike" violated her federal constitutional rights.  The

7   United States Supreme Court has not "squarely addressed" whether a state court's exercise of

8   discretion to exclude testimony violates a criminal defendant's right to present relevant evidence.

9   *Moses*, 555 F.3d at 758-59.  Accordingly, the decision of the California Court of Appeal that the

10  trial court's evidentiary ruling did not violate the federal constitution is not contrary to or an

11  unreasonable application of clearly established United States Supreme Court precedent and may

12  not be set aside.  *Id.  See also Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (per curiam)

13  (relief is "unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions "given

14  no clear answer to the question presented, let alone one in [the petitioner's] favor," because the

15  state court cannot be said to have unreasonably applied clearly established Federal law).[4]

16         In any event, the exclusion of evidence regarding "Northside Mike" did not result in a

17  violation of petitioner's right to present a defense.  Evidence of potential third-party culpability

18  must be admitted when, under the "facts and circumstances" of the individual case, its exclusion

19  would deprive the defendant of a fair trial.  *Chambers*, 410 U.S. at 303.  The Court of Appeals

20  for the Ninth Circuit has determined that where the proffered evidence simply affords a possible

21  ground of suspicion pointing to a third party and does not directly connect that person with the

22

23         [4] In the past, the Ninth Circuit applied a "balancing test" to assess the constitutionality of
    a trial court's discretionary decision to exclude evidence.  *See Miller v. Stagner*, 757 F.2d 988,
24  994–95 (9th Cir. (1985).  However, in *Moses*, the Ninth Circuit concluded that the *Miller*
    balancing test "is a creation of circuit law," rather than clearly established Supreme Court
25  precedent, for purposes of Section 2254(d)(1).  555 F.3d at 759–60.  Therefore, the *Miller* test
    should not be used in federal habeas review of a challenge to a state court's exercise of
26  discretion to exclude testimony pursuant to a state evidentiary rule affording such discretion.  *Id.*

1  actual commission of the offense, that evidence may be excluded.  *See People of Territory of*

2  *Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) (citing *Perry v. Rushen*, 713 F.2d 1447, 1449

3  (9th Cir. 1983)).  Under California law, a criminal defendant has a right to present evidence of

4  third party culpability if it is capable of raising a reasonable doubt regarding his own guilt.  *See*

5  *Spivey*, 194 F.3d at 978 (citing *People v. Hall*, 41 Cal. 3d 826, 833 (1986)).  In order for

6  evidence pointing to another suspect to be admissible, however, "there must be direct or

7  circumstantial evidence linking the third person to the actual perpetration of the crime."  *Hall*, 41

8  Cal. 3d at 833.  Motive or opportunity is not enough.  *Id.*[5]

9          There is no evidence in the record that Northside Mike hired or even knew the shooters.

10  Will testified at the hearing to determine the admissibility of the third-party culpability evidence

11  that, while he originally thought the two cars approaching the apartment were related to the

12  situation with Northside Mike, he changed his mind when he saw that the passengers were

13  Black.  Reporter's Transcript on Appeal (RT) at 23, 26-27.  He testified that he knew Mike was

14  not involved in the shooting "because there were black people" in the two cars.  *Id.*  As discussed

15  above, the trial court excluded the third-party culpability evidence on the grounds that it was too

16  insubstantial to be relevant.  In his ruling, the judge noted that there was no evidence Bubba had

17  been involved in the prior fights with Northside Mike, that Northside Mike was involved with a

18  White Supremacist group and "did not associate with African-Americans," and that all of the

19  individuals in the shooter's car were Black.  *Id.* at 61-62.  The judge concluded:

20              In other words, the connection is remote.  The connection is not
            made in such a way that North Side Mike is linked specifically
21          with the victim in terms of retaliation at all, and motivation is
            simply not enough and the threat if there were any was a
22          conditional one, the condition precedent for which according to the
            witness had not been established.  So it's entirely too remote,
23          conjectural, and there is not a sufficient link for the Court under
            the law of third party culpability to allow it.  It would confuse the
24          issues for the jury and cause a mini trial on an issue that the district

25

26  [5] In *Holmes*, the Supreme Court noted that rules such as that set forth in <u>Hall</u> are "widely accepted."  547 U.S. at 327 n.*.

16

1        attorney can't even address because we don't even know for sure
         who North Side Mike is or where he lives or anything else about
2        him.

3    *Id.* at 62.

4        The California Court of Appeal agreed with the trial court that the evidence regarding

5    Northside Mike was too insubstantial to be admissible as evidence of third party culpability.  The

6    appellate court also noted that the evidence was inherently prejudicial because it included

7    testimony about a White supremacist gang.  These conclusions are not unreasonable.  The

8    evidence about Northside Mike and his feud with Will and Bubba did not directly link Mike with

9    the shooting. Further, petitioner's theory relied on speculation that Mike or his allies

10   coincidentally showed up at the apartment at the same instant that petitioner arrived.  The trial

11   evidence did not support this theory, but showed that the second car closely followed the first car

12   to the apartment, even making a U-turn at the same time, and that both cars left the scene

13   together.  At most, petitioner's proposed evidence provided a possible motive for the crime.  The

14   exclusion of such evidence did not violate petitioner's federal constitutional rights.[6]

15       For all of the foregoing reasons, petitioner is not entitled to relief on this claim.

16                              **2. Jury Instruction Error**

17       In petitioner's next ground for relief, she claims that the trial court violated her right to

18   due process and "trial by jury" when it failed to instruct that jury that "if they found that Will

19   and Bubba's armed confrontation with the shooter in the second car was an intervening act that

20   negated causation, petitioner could not be held responsible for Bubba's death."  Dckt. 5 at 39.

21   ////

22   ////

23   ////

24

25       [6] At the end of the hearing to determine the admissibility of this evidence, the trial court
     stated that the defense could raise the issue again if they were able to locate Northside Mike.  RT
26   at 62.  Apparently, the matter was never raised again by petitioner's counsel.

1    In the last reasoned state court decision on this claim, the California Court of Appeal

2  ruled as follows:

3          Defendant claims the trial court erred by failing to instruct the jury
           on intervening cause.  She asserts "the sudden appearance of two
4          armed men in close proximity to the shooter" mandated an
           instruction on intervening cause.
5
6          The record does not show that defendant requested an instruction
           on intervening causation.[7] During oral argument, counsel conceded
7          that none was tendered below.  A trial court must instruct sua
           sponte on the general principles of law that are closely and openly
8          associated with and necessary to the jury's understanding of the
           case.  The duty to instruct sua sponte arises only when the facts of
9          the case support the particular instruction.  (*People v. Montoya*
           (1994) 7 Cal.4th 1027, 1047.)
10
           "The determination of whether defendant's unlawful act or acts
11         were a proximate cause of the death is a question for resolution by
           the trier of fact [citation] and is determined according to the
12         ordinary principles governing proximate causation."  (*People v.
           Harris* (1975) 52 Cal.App.3d 419, 427.) ""'A defendant may be
13         criminally liable for a result directly caused by his act even if there
           is another contributing cause.  If an intervening cause is a normal
14         and reasonably foreseeable result of defendant's original act the
           intervening act is 'dependent' and not a superseding cause, and
15         will not relieve defendant of liability. . . . '(1) The consequence
           need not have been a strong probability; a possible consequence
16         which might reasonably have been contemplated is enough.  (2)
           The precise consequence need not have been foreseen; it is enough
17         that the defendant should have foreseen the possibility of some
           harm of the kind which might result from his act. . . .'"'  [Citation.]
18         [¶]  'Thus, it is only an unforeseeable intervening cause, an
           extraordinary and abnormal occurrence, which rises to the level of
19         an exonerating, superseding cause. [Citations.]'  [Citation.]"
           (*People v. Hansen* (1997) 59 Cal.App.4th 473, 479.)
20
           Defendant's claim is not supported by the record.  McElroy
21         testified that while he had a gun, it was kept hidden until the
           person in the white car opened fire.  Though McElroy told the
22         police Bubba was carrying two guns, and Bubba had gunshot
           residue on his hands, McElroy testified that this was a lie designed
23         to keep McElroy from getting into trouble for possessing a firearm.

_____

24       [7]  The clerk's transcript does not contain the jury instructions, the list of proposed
     instructions, or the instructions proposed by either side.  This Court granted defendant's request
25   to augment the record, but the Sacramento County Superior Court could not find any jury
     instructions or references to the instructions in the file.  This is not explained by the superior
26   court staff.  Defendant makes no attempt to capitalize from this failure.

> The record contains no evidence that either McElroy or Bubba
> displayed a weapon before the person in the white car opened fire.
> There is no evidence that the shooters knew either McElroy or
>
> Bubba was armed before the shooting.  The trial court was under
> no duty to give sua sponte an intervening cause instruction.

Opinion at 13-14.

In general, a challenge to jury instructions does not state a federal constitutional claim. *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).  To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'"  *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (same).

Upon review of the jury instructions given in this case, the court concludes that petitioner's trial was not rendered fundamentally unfair because of the trial court's failure to instruct the jury that the arrival of the shooters could have been an intervening act that severed the causal link between petitioner and the shooting.  As noted by respondent, the jury was correctly instructed that in order to convict petitioner of murder they must find that she committed an act that caused the victim's death.  RT at 1135-36.  Further, as discussed above,

1   the evidence regarding Northside Mike was too speculative to constitute competent evidence of

2   third-party culpability and was therefore properly excluded by the trial court.  In light of this, the

3   jury instruction now suggested by petitioner would not have been consistent with any of the

4   evidence at trial.  Finally, as noted by the California Court of Appeal, petitioner's trial counsel

5   did not request that a jury instruction on intervening cause be given.  "It is the rare case in which

6   an improper instruction will justify reversal of a criminal conviction when no objection has been

7   made in the trial court."  *Henderson*, 431 U.S. at 154.

8          Petitioner has failed to demonstrate that the state court decision with respect to this claim

9   was contrary to or an unreasonable application of United States Supreme Court authority.

10  Accordingly, petitioner is not entitled to relief on this claim.

11                        **3.  Insufficient Evidence**

12         Petitioner's final claim is that the evidence introduced at her trial was insufficient to

13  support the jury's verdict.  Dckt. 1 at 8-12; Dckt. 5 at 43-50.  She argues that there was no

14  evidence she knew Bubba or the shooters in the second car, and that the evidence reflected the

15  shooting was the result of the altercation between Will, Bubba, and Northside Mike.  *Id.*  She

16  argues the evidence supporting the verdict is "flimsy, inconsistent, and unreliable."  Dckt. 5 at

17  45.  She also contends that "Will and Bubba's arrival and armed confrontation with the shooter

18  was an intervening act th[at] broke the chain of causality between the brawl at the market and . . .

19  Bubba's death."  *Id.* at 48.

20         The California Court of Appeal rejected these arguments, reasoning as follows:

21             Defendant contends there is insufficient evidence to support her
               murder conviction.
22
               Under the substantial evidence rule, we review the facts adduced at
23             trial in the light most favorable to the judgment, drawing all
               inferences in support of the judgment to determine whether there is
24             substantial direct or circumstantial evidence that defendant
               committed the charged crime.  (*People v. Hillhouse* (2002) 27 Cal
25             .4th 469, 496.)  The test is not whether the evidence proves guilt
               beyond a reasonable doubt, but whether substantial evidence, of
26             credible and solid value, supports the jury's conclusions.  (*People*

*v. Mincey* (1992) 2 Cal.4th 408, 432.) We may not reweigh the evidence and substitute our judgment for the trier of fact; all conflicts in the evidence must be resolved in favor of the judgment. (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)  Under this standard of review, defendant's challenge to the sufficiency of the evidence fails.

The evidence establishes defendant's motive to attack the people in Porchia's car.  They fought defendant, dislocated her shoulder, and damaged her car.  Defendant acted on this motive by following Porchia's car back to the apartment.  Defendant's testimony that she followed the car to get the license plate number in order to assist police involvement is contradicted by her failure to contact the police or any other authority.  Her claim that the shooting scared her does not explain defendant's failure to call 911 or the police immediately after the fight or during her pursuit of Porchia's car.

Testimony about defendant's remarks after the fight supports a finding she orchestrated the shooting.  Defendant was seen calling on the cell phone saying she had been jumped while alluding to a need to carry a gun.  She directed her contact on her phone to "be strapped," meaning to come armed.  She also told her adversaries they would be "popped," a euphemism for being shot.  Defendant was heard saying she and Deloney had been jumped and giving directions on how to find her.

Porchia's testimony shows defendant followed her, even making a U-turn in order to continue the chase.  The white car which was soon following defendant's Cutlass kept following as defendant made the U-turn.  Defendant's car and the white car were placed at Porchia's apartment complex no more than a foot apart, and the shooter was in the white car.

Porchia testified a female voice from one of the cars was taunting her and the other participants in the fight by yelling, "Bitch, come on down here."  Kevin Turk, who was inside the apartment, also heard female voices yelling from downstairs.  Because he was indoors and not on the balcony, he did not know which car the yelling women occupied.  Both McElroy and Scott testified they heard and saw the women in the blue car yelling at the women on the balcony.  Deloney herself testified she yelled, "Come downstairs, bitch."  Lockhart heard a female voice exclaim they would blow the place up just before the shooting started.

Taken together, this evidence supports the conclusion that defendant, in response to the fight, used the cell phone to call people to organize an armed conspiracy to follow Porchia's vehicle home in retaliation for the incident in the Rainbow Market parking lot.  The retaliation took the form of the drive-by shooting which killed Bubba.  This constitutes substantial evidence supporting

21

1     defendant's murder conviction.

2     "The doctrine of conspiracy plays a dual role in our criminal law."
      (*People v. Salcedo* (1994) 30 Cal.App.4th 209, 215 (*Salcedo*).)  It
3     is both a substantive offense and "proof of a conspiracy [which]
      serves to impose criminal liability on all conspirators for crimes
4     committed in furtherance of the conspiracy."  (*Ibid.*)

5     "This second aspect of conspiracy – which imposes joint liability
      on conspirators – operates independently of the first aspect, which
6     makes a conspiracy itself a crime."  (*Salcedo, supra*, 30
      Cal.App.4th at p. 215.)  Therefore, it has long been held that an
7     uncharged conspiracy may be used to establish the criminal
      liability of a conspirator.  (*Id.* at pp. 215-216.)

8
      The prosecution's theory of conspiracy is supported by substantial
9     evidence.  Although defendant did not shoot Bubba, she is not
      relieved of her liability for his murder.  She set the forces in
10    motion that resulted in murder.  Since defendant conspired with the
      shooters in the white car, she is liable for the murder committed by
11    them.

12    That the victim was not a party to the fight in the Rainbow Market
      parking lot is of no consequence.  Under the doctrine of transferred
13    intent, if a defendant shoots with the intent to kill a certain person
      but hits a bystander instead, he is subject to the same criminal
14    liability as if he had accomplished his intended purpose.  (*People
      v. Shabazz* (2006) 38 Cal.4th 55, 62.)  While defendant may have
15    conspired to harm the people who participated in the fight, the
      shooters she recruited appear to have chosen a more convenient
16    target, when one of them called the unarmed, unfortunate, and
      portly Bubba, "fat boy."  Bubba was on the grass not more than 30
17    feet from the white car when someone in the white car mortally
      shot him, while the other participants in the earlier fight stayed on
18    the balcony.  Although he had gunshot residue on his hands, this is
      consistent with Bubba being within an arm's length of McElroy,
19    who admitted to returning fire at the gunmen.

20    All of the evidence establishes an attack orchestrated by defendant.
      That it killed an entirely innocent bystander, apparently for being
21    portly, makes the killing more tragic, but it does not support
      defendant's claim of insufficient evidence of murder.

22

23    Opinion at 15-18.

24          There is sufficient evidence to support a conviction if, "after viewing the evidence in the

25    light most favorable to the prosecution, any rational trier of fact could have found the essential

26    elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

                                            22

1    (1979).  "[T]he dispositive question under *Jackson* is 'whether the record evidence could

2    reasonably support a finding of guilt beyond a reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d

3    978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).  A petitioner in a federal habeas

4    corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used

5    to obtain a state conviction on federal due process grounds."  *Juan H. v. Allen*, 408 F.3d 1262,

6    1274, 1275 & n.13 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the

7    decision of the state court reflected an objectively unreasonable application of *Jackson* and

8    *Winship* to the facts of the case.  *Id.*

9         The court must review the entire record when the sufficiency of the evidence is

10   challenged in habeas proceedings.  *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

11   *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987).  It is

12   the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

13   reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  If the trier

14   of fact could draw conflicting inferences from the evidence, the court in its review will assign

15   the inference that favors conviction.  *Turner v. Calderon*, 281 F.3d 851, 881-82 (9th Cir. 2002).

16   The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but

17   whether the jury could reasonably arrive at its verdict.  *United States v. Mares*, 940 F.2d 455,

18   458 (9th Cir. 1991).  The federal habeas court determines the sufficiency of the evidence in

19   reference to the substantive elements of the criminal offense as defined by state law.  *Jackson*,

20   443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

21        Viewing the evidence in the light most favorable to the verdict, and for the reasons

22   expressed by the state appellate court, there was sufficient evidence introduced at petitioner's

23   trial to support the jury's verdict.  As explained by the state court, there was evidence introduced

24   at petitioner's trial from which a rational jury could conclude that petitioner orchestrated the

25   arrival of the second car at Porchia's apartment in order to avenge the fight at the convenience

26   store, and that the shooting of Bubba was a direct result of these actions.  This evidence is

1  sufficient to support petitioner's conviction for second degree murder on a conspiracy theory, as

2  that crime is defined by California law.  The conclusion of the state court that sufficient evidence

3  supported the guilty verdict in this case is not contrary or an unreasonable application of United

4  States Supreme Court authority.  Accordingly, petitioner is not entitled to relief on this claim.

**III.  Conclusion**

6          For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

7  application for a writ of habeas corpus be denied.

8          These findings and recommendations are submitted to the United States District Judge

9  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

13  within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

14  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

15  his objections petitioner may address whether a certificate of appealability should issue in the

16  event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

17  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

18  enters a final order adverse to the applicant).

19  DATED:  January 4, 2012.

20

21                                    EDMUND F. BRENNAN
                                      UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

24